**STATE of Missouri ex rel. LACLEDE GAS COMPANY, Respondent,**

v.

**PUBLIC SERVICE COMMISSION of the State of Missouri, Appellant.**

No. WD 63563.

Missouri Court of Appeals,
Western District.

March 1, 2005.

Thomas R. Schwarz, Jr., Jefferson City, MO, for appellant.

Michael Charles Pendergast and Lawrence Carl Friedman, St. Louis, MO, for respondent.

Before HOWARD, P.J., ULRICH and BRECKENRIDGE, JJ.

VICTOR C. HOWARD, Presiding Judge.

The Public Service Commission approved a tariff implementing a three-year incentive hedging program, under which Laclede Gas Company was permitted to purchase and sell natural gas call options on future natural gas deliveries to manage the risk of fluctuations in natural gas market prices and create cost savings. The program provided certain incentives to Laclede to achieve the price protection and cost reduction benefits to its customers.

At issue in this appeal is approximately $4.9 million that Laclede kept as its share of incentive proceeds realized from the program. In its Report and Order ("the Commission's Order"), the Commission concluded that Laclede was required to flow back to its customers the $4.9 million.

Laclede petitioned for a writ of review in the Circuit Court of Cole County. The circuit court held that the Commission's Order was both unlawful and unreasonable, so it vacated the Order and remanded the cause to the Commission. The Commission then filed its notice of appeal to this court.

For the reasons set forth below, we affirm the trial court's judgment reversing the Commission's Order and remand.

## Facts[1]

**A.  The Price Stabilization Program:** Laclede is a public utility that distributes, transports, and sells natural gas to approximately 630,000 retail customers in eastern Missouri. In July of 1999, the Commission approved a tariff implementing a three-year incentive hedging program called the Price Stabilization Program ("PSP Tariff" or "the Program").[2] Under the Program, Laclede was authorized to engage in the purchase and sale of natural gas call options as a means of hedging the price of its gas supply to provide its gas customers some protection against increased market gas prices.[3] The PSP Tariff allowed Laclede to collect $4 million annually from its customers to fund the Program.

Additionally, the PSP Tariff specified that a significant share of the gains real-

---

1.  The Commission explicitly accepted Laclede's Statement of Facts in its brief, so we borrow in large part from Laclede's Statement of Facts without further attribution.

2.  The Commission initially approved the Program in 1997, and then extended and substantially modified the Program in its Report and Order issued June 15, 1999. That modified Program is the subject of this appeal.

3.  A call option is a financial instrument sold on the New York Mercantile Exchange (N.Y.MEX). In exchange for paying a specific amount, the call option entitles, but does not require, the buyer to receive a specific amount of natural gas in a future month at a predetermined "strike price." As the Commission explains in its Order:

    The hedging function of call option trading works this way. The gas company pays a premium to purchase a call option at a specified strike price. If the price of natural gas goes up above the strike price, the company can sell the call option at a profit and use the proceeds to offset the increased cost of natural gas. For that quantity of gas, the customer effectively pays the strike price, even if the actual cost of natural gas is higher. If the price of natural gas stays below the strike price and the call option expires valueless, the customer is out the cost of the premium but has obtained the value of having the price protection in place in case it were needed. This situation is similar to the purchase of car insurance. If a car owner purchases insurance and does not have an accident, the owner is out the cost of the premium. However, for the premium, the owner has received the intangible value associated with a reduction of risk.

ized by Laclede from call option trading would be passed through to Laclede's customers in the form of lower prices. Laclede was entitled to retain a specified share of such gains as an incentive to achieve such benefits for its customers. The PSP Tariff had two separate incentive features: (1) The Overall Cost Reduction Incentive; and (2) The Price Reduction Incentive.

1. **Overall Cost Reduction Incentive:** This portion of the PSP Tariff authorized Laclede to retain a specified percentage of any gains (40% or 60% depending upon how much customer savings had been generated) realized from "intermediate" trading activities, in which the call options were *sold prior to the last three business days* of NYMEX trading.

2. **Price Reduction Incentive:** This portion of the PSP Tariff authorized Laclede to retain a specified portion of the proceeds realized when the call options were *sold during the last three business days* of NYMEX trading. If the hedged price exceeded a certain level, Laclede was required to give its customers credits. The Price Reduction Incentive also included an "opt-out" provision, under which Laclede would be permitted to opt-out of the Price Reduction Incentive if there were radical changes in the market price for natural gas during the first 90 days of any Program year. The Cost Reduction Incentive did not contain an opt-out provision.

**B. Stipulation and Agreement:** In March of 2000, the second year of the incentive program, the price of natural gas rose quickly and steeply to unprecedented levels. Accordingly, on June 1, 2000, Laclede exercised its right to opt out of the Price Reduction Incentive for the 2000–2001 heating season. Laclede also applied to the Commission for a number of temporary changes in the Program. For exam-

ple, Laclede requested the elimination of the Program's requirement that Laclede purchase options covering 70% of its winter supply, an increase in the amount Laclede could collect from its customers to fund the Program, and an expansion of the type of financial instruments Laclede could procure. The Staff of the Commission ("Staff") recommended the Commission grant only part of the relief requested by Laclede. Public Counsel recommended that the Commission reject Laclede's application and instead instruct the Company to comply with the terms of the Program.

Ultimately, on September 1, 2000, Staff, Public Counsel, and Laclede filed a "Unanimous Stipulation and Agreement." The Stipulation and Agreement stated that the parties were only able to agree that Laclede's request to eliminate the 70% coverage requirement should be granted. The Stipulation and Agreement provided in relevant part:

> By permitting Laclede to obtain price protection for lesser volumes, such a revision will help to reduce the price at which such protection will be triggered for these volumes. Since the winter heating season is only slightly more than two months away, it is critical that such provisions be approved as soon as possible. Accordingly, the undersigned Parties recommend that the Commission issue its Order adopting these modifications at the earliest practical time.
>
> ... Since the Parties were unable to agree on [Laclede's] other proposed revisions to the PSP, *"all remaining provisions of the existing PSP currently in effect will remain in full force and effect."*

(Emphasis added.)

On September 28, 2000, the Commission approved the Stipulation and Agreement. On October 5, 2000, Laclede filed a compliance tariff implementing the changes to

the PSP Tariff as reflected in the Stipulation and Agreement. Staff subsequently reviewed and recommended the Commission's approval of the compliance tariff. On October 12, 2000, the Commission approved the compliance tariff, which explicitly stated that Laclede's purchase of call options under the PSP was:

> subject to the incentive features described [in the PSP Tariff]. Except as modified by the terms of the September 1, 2000 Unanimous Stipulation and Agreement approved by the Commission [temporarily modifying the original 70% coverage requirement], and subject to [Laclede]'s notice of opting out of the price protection incentive features in year two....

During the 2000–2001 heating season, Laclede operated as provided in the compliance tariff. In addition to the approximately $4 million received from customer billings for Program funding, Laclede used approximately $5 million from its gains on trading to purchase more call options as authorized by the Overall Cost Reduction Incentive. Laclede's total gains from options trading in the 2000–2001 year were approximately $33.5 million. After taking into account the $5 million in reinvested gains, the trading resulted in a net gain of $28.5 million, $11.5 million of which was realized from the sale of call options during the last three business days of NYMEX trading—the period of trading subject to the Price Protection Incentive. Because Laclede had exercised its right to opt out of the Price Protection Incentive, it immediately flowed through to its customers the entire $11.5 million in the form of reductions to the Company's

Purchased Gas Adjustment rates pursuant to expedited procedures requested by Laclede and approved by the Commission.

The remaining $17 million of proceeds was realized from Laclede's sale of call options prior to the last three days of NYMEX trading (intermediate trades). These proceeds were subject to sharing between Laclede ($8.9 million) and its customers ($8.1 million) pursuant to the terms of the Overall Cost Reduction Incentive. Laclede immediately passed the $8.1 million through to its customers. Laclede also requested and obtained approval from the Commission to contribute $4 million of the Overall Cost Reduction Incentive to fund the Program's third year. Laclede sought to retain the remaining $4.9 million in proceeds, which are at issue in this appeal.

**C. The Commission's Order:** Pursuant to the provisions of the Program, the Commission annually reviewed Laclede's recovery of gas costs to determine whether such costs had been prudently incurred and/or otherwise accounted for in compliance with Laclede's approved tariffs. Thus, the Commission initiated Case No. GR 2001–387 ("2001 case") to review Laclede's recovery of gas costs during the 2000–2001 Actual Cost Adjustment ("ACA") period. This period ended September 30, 2001, so it included the second year of the Program.[4]

On June 28, 2002, Staff filed its recommendation in the 2001 case, in which it proposed that Laclede be required to flow through to its customers the $4.9 million that Laclede had retained under the Over-

---

4. At the parties' request, the Commission consolidated the 2001 case with Case No. GR–2000–622, which the Commission had initiated for review of 1999–2000 ACA period. The Commission's Order indicates that "[u]ltimately, Staff and Laclede agreed upon all issues relating to the 1999–2000 Actual Cost Adjustment and nothing regarding that [case was] presented to the Commission for resolution." Thus, only the 2001 case is at issue in this appeal.

all Cost Reduction Incentive. Staff recognized that the Overall Cost Reduction Incentive remained in effect. Nevertheless, Staff claimed that a new methodology demonstrated that Laclede had not achieved any savings under the Program. Laclede opposed the adjustment on the grounds, among others, that this new methodology was unauthorized by, and flatly inconsistent with, the express language of the PSP Tariff.

In its April 29, 2003 Order, the Commission concluded as a matter of law that Laclede was "not entitled to retain approximately $4.9 million in proceeds from the sale of call options in the winter of 2000–2001, under the Overall Cost Reduction Incentive provisions of the Company's Price Stabilization Program."

The Commission interpreted the meaning of the Program and PSP Tariff that implemented it to determine the intent of Laclede in creating the Program and the Commission's intent in approving the Program. In doing so, the Commission analyzed what it referred to as "two, closely interrelated incentive features that were designed to maximize the protection afforded to customers, while minimizing the cost of that protection." The Commission held:

> When both incentive clauses were working the program and tariff made sense. Both Laclede and its customers could benefit from the sale of call options. Both could receive a share of profits, but more importantly, Laclede's customers received the benefit of having price protection against an unexpected increase in natural gas prices. Unfortunately, when natural gas prices skyrocketed beginning in May of 2000, Laclede was in a position where it had to withdraw from the Price Protection Incentive portion of the [PSP] Program. Consumers were left without the price protection to which they were entitled under the program.

The Commission openly acknowledged Laclede's argument that the Overall Cost Reduction incentive remained in effect after it opted out of the Price Protection Incentive, and Staff did not dispute this argument. But, the Commission concluded:

> ... [W]ithout the price protection function of the Price Protection Incentive element of the program, the Overall Cost Reduction Incentive was merely a meaningless vestige. Intermediate trading of call options did not necessarily provide any price protection to Laclede's customers. Laclede could sell its hedge positions at any time and collect and keep a portion of the proceeds. Meanwhile, the price of natural gas used by those customers could keep rising after Laclede had sold out of its hedge position, leaving the customers unprotected. For example, the selling price of natural gas may have been $1.00 above the strike price ten days before the expiration of the call option. If the call option is sold on that date, Laclede and its customers would get to share in a profit of $1.00. However, if by the expiration date of that call option the price of gas has risen to $3.00 above the strike price, can it still be said that Laclede's customers have profited? Laclede has its share of the profit from the sale of the call option and it can pass the increased cost of natural gas on to its customers. The customers, however, have to pay for the gas out of their own pockets.
>
> What is more, when Laclede withdrew from the Price Protection Incentive clause it no longer had any incentive to hold call options until near their expiration, and thereby provide some protection to its customers against rising gas

costs. Instead, Laclede actually had a perverse incentive to sell its call options early, before the last three trading days, when it could still share in the proceeds of the sale.

The Commission can only conclude that neither the Commission, nor Laclede intended to create such an unlikely and unfair outcome when they created the [PSP] Program. There is no reason to believe that Laclede was in any way blameworthy because of its decision to withdraw from the Price Protection Incentive element of the program. Certainly, Laclede was not responsible for the spike in natural gas prices that shocked consumers in the winter of 2000–2001. However, there is no reason to believe that Laclede should be allowed to share in the illusory profits it made from trading in call options while the price that consumers had to pay for natural gas soared.

There was only one Price Stabilization Program. To permit the [PSP] Program and its enabling tariff to operate as proposed by Laclede would frustrate the intent of the Commission and Laclede in creating the program and approving the tariff. Therefore, the Commission concludes that as a matter of law, the Overall Cost Reduction Incentive element of the [PSP] Program ceased to function at the same time that Laclede exercised its right to withdraw from the Price Reduction Incentive element of the program. Therefore, Laclede is not entitled to claim a share of the proceeds from the sale of call options under the terms of that incentive element.

The Commission noted that its conclusion "must bump up against the Stipulation and Agreement." It explicitly recognized that the Stipulation and Agreement provided, " '[s]ince the parties were unable to agree on the Company's other proposed revisions to the PSP, all remaining provisions of the existing PSP currently in effect will remain in full force and effect.' " But, the Commission concluded:

[This] language does not affirmatively state that any particular element of the Price Stabilization Program is in effect. It simply states that this Stipulation and Agreement does not change the effectiveness of any provision of the Program. Thus, if, as the Commission has found, the Overall Cost Reduction Incentive element became ineffective at the same time as did the Price Reduction Incentive element, then this Stipulation and Agreement does nothing to resuscitate that element.

The Commission's focus, in its decision, on the lapse of the overall cost reduction incentive is in sharp contrast with the evidence presented at the hearing. Throughout the entire Commission proceeding, both Laclede and Staff maintained that the Overall Cost Reduction Incentive remained in effect during the 2000–2001 heating season. The testimony and briefing before the Commission focused on the disputed question of how savings under the Overall Cost Reduction Incentive were to be calculated and divided between Laclede and its customers. After the record was closed, Staff suggested, for the first time, in its April 10, 2003 Proposed Findings of Fact, that the Commission could find that the Overall Cost Reduction Incentive terminated when Laclede opted out of the Price Protection Incentive. Laclede sought permission to reopen the record to address this argument. The Commission denied Laclede's request, stating it its Order:

The Commission is mindful of the fact that it is deciding this case on the basis of a theory that has not been argued by any party. Laclede, of course, argues that it should be allowed to retain its

share of proceeds under the Overall Cost Reduction Incentive. Staff has consistently offered the theory that the Overall Cost Reduction Incentive remained in effect, but that savings under that incentive had to be calculated in a more restrictive manner. Laclede contends that by deciding this case on a different theory, the Commission has denied it an opportunity to present evidence to refute the allegations against it, thereby denying it its right to due process of law.

In other circumstances, Laclede might be correct. However, in this case the Commission is reaching its decision entirely upon the basis of its conclusions of law about the meaning of the words of a tariff and a stipulation and agreement. Those documents clearly are in the record of this case and both parties have presented extensive information about them. Laclede has presented evidence and argument about both documents, and no additional testimony could change the words of either the tariff or the Stipulation and Agreement. As a result, in this case, Laclede's due process rights have not been compromised.

**D. The Circuit Court's Judgment:** On June 18, 2003, Laclede filed its Petition for Writ of review in the Circuit Court of Cole County. After briefing, the circuit court heard oral argument on October 10, 2003. At the conclusion of the oral argument, the circuit court stayed the Commission's order pending completion of proceedings on the Petition for Writ of review, including any appeals.

On November 5, 2003, the circuit court issued its Findings of Fact, Conclusions of Law, Order and Judgment, vacating the Commission's Order because its decision was unlawful, unreasonable, arbitrary and capricious, and an abuse of discretion. The court concluded that under the plain language of the PSP Tariff, Laclede was entitled to retain the $4.9 million.

This appeal follows.

### Standard of Review

We review the Commission's Order, not the circuit court's judgment, to determine whether the Order was lawful and, if so, whether it was reasonable. § 386.510;[5] *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n,* 120 S.W.3d 732, 734 (Mo. banc 2003). As the adverse party, Laclede has the burden of proof "to show by clear and satisfactory evidence that the . . . order of the commission complained of is unreasonable or unlawful as the case may be." § 386.430; *AG Processing,* 120 S.W.3d at 734. If statutory authority for the Commission's Order exists, then it is "lawful." *Id.* If we determine the Commission's Order is lawful, we must then consider whether it is reasonable, that is, whether the Order "was supported by substantial and competent evidence on the whole record, whether the decision was arbitrary, capricious, or unreasonable, or whether the [Commission] abused its discretion." *State ex rel. Associated Natural Gas Co. v. Pub. Serv. Comm'n,* 954 S.W.2d 520, 528 (Mo.App. W.D.1997).

### Discussion

Although Laclede challenges the Commission's Order as "unlawful" in its first point on appeal, neither party argues the Commission lacked statutory authority to act, which is the test for determining whether the Order is "lawful." There is no dispute that pursuant to Chapters 386 and 393, the Commission has the authority to regulate Laclede, which is a public utility.

---

5. Statutory references are to the Revised Statutes of Missouri (2000).

■ Confusion may arise as to reviewing for "lawfulness" because the Commission explicitly decided the issue based on its legal interpretation of the language of the PSP Tariff and the Stipulation and Agreement. Indeed, as pointed out by Laclede, in determining the lawfulness of the Commission's Order, we will "correct erroneous interpretations of the law." *State ex rel. Alma Tel. Co. v. Pub. Serv. Comm'n,* 40 S.W.3d 381, 388 (Mo.App. W.D.2001). But at this stage of review, we would only review an erroneous interpretation of law governing the Commission's statutory authority. The propriety of the Commission's legal interpretation of the PSP Tariff and the Stipulation and Agreement pertains to the reasonableness of the Order, not its lawfulness. Because the Commission's Order is lawful in that it was statutorily authorized, we next examine the Order's reasonableness.

■ The issue in this case is whether the Overall Cost Reduction Incentive automatically terminated when Laclede exercised its right to opt-out of the Price Protection Incentive for the 2000–2001 heating season. The Commission concluded in its Order that despite the unambiguous language of the PSP Tariff and the Stipulation and Agreement, it would be so illogical for the Overall Cost Reduction Incentive to survive Laclede's rightful decision to opt out of the Price Protection Incentive that, *as a matter of law,* a different result must have been intended. Our review of legal issues is *de novo,* with no deference to the Commission. *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n,* 120 S.W.3d 732, 734 (Mo. banc 2003).

■ Once the Commission approved the PSP tariff, it became Missouri law. *Allstates Transworld Vanlines, Inc. v. Southwestern Bell Tel. Co.,* 937 S.W.2d 314, 317 (Mo.App. E.D.1996). Thus, the PSP Tariff has "the same force and effect as a statute directly prescribed from the legislature," so we interpret the tariff in the same manner we interpret a statute. *Id.* Accordingly, our role in interpreting the PSP Tariff is to "ascertain the intent of [Laclede and the Commission] from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning." *Wolff Shoe Co. v. Dir. of Revenue,* 762 S.W.2d 29, 31 (Mo. banc 1988). We can look beyond the plain and ordinary language of the PSP Tariff "only when the meaning is ambiguous or [acceptance of the plain and ordinary language] would lead to an illogical result defeating the purpose of the [tariff]." *State ex rel. Maryland Heights Fire Prot. Dist. v. Campbell,* 736 S.W.2d 383, 387 (Mo. banc 1987). The Commission recognized this standard for interpreting the PSP Tariff and duly noted:

> Of course, when dealing with a tariff, there is no legislative intent to be discerned. However, when interpreting the meaning of the Price Stabilization Program and the tariff that implemented it, it is necessary to discern the intent of Laclede in creating the program, as well as the intent of the Commission in approving the program.

The Commission openly agreed that the plain and ordinary language of the PSP Tariff and the Stipulation and Agreement confirmed that the Overall Cost Reduction Incentive survived Laclede's opting out of the Price Protection Incentive. But a 3–2 majority of the Commission found that the parties did not "intend" the PSP Tariff and the Stipulation and Agreement to mean what the plain language said.

In arriving at this conclusion, the Commission set forth hypothetical calculations of how market fluctuations could have effected Laclede's trading of call options at

different times before querying, "can it still be said that Laclede's customers have profited?" During proceedings before the Commission, Staff advanced similar hypothetical calculations in support of its argument that a new methodology demonstrated that Laclede had not achieved any savings under the Program. Laclede argued those calculations were improperly based on hindsight. The Commission addressed Laclede's argument in its Order as follows:

Laclede suggested for Staff to sit back two years after the fact, examine the results and find occasions where Laclede could have made more money by trading earlier or later. But Laclede was trading without the benefit of hindsight, and it contended that it did the best job that it could. Laclede argued that it should be allowed to keep the share of savings to which it would be entitled under the Overall Cost Incentive.

After carefully considering the question, the Commission finds that Laclede is correct. Staff's hypothetical calculations of what might have been the result if Laclede had chosen to trade call options differently is entirely based on hindsight and is not to be found anywhere in the description of the Price Stabilization Program or the tariff designed to implement the program. Staff was not able to provide a reasonable calculation to determine how savings could have been calculated under the Overall Cost Reduction Incentive after the Price Reduction Incentive was no longer operable. This is not a criticism of Staff or its witness because there is probably no formula that could create such a calculation with any certainty. *The formula contained in Laclede's tariff indicates that Laclede is entitled to keep the $4.9 million in proceeds under the Overall Cost Reduction Incentive.* The question then becomes wheth-

er the Overall Cost Reduction Incentive of that tariff was still effective after Laclede opted out of the Price Reduction Incentive.

(Emphasis added.)

The Commission's reasoning for concluding, as a matter of law, that contrary to the plain language of the PSP Tariff, the parties did not intend for the Overall Cost Reduction Incentive to remain effective, is similarly based entirely on hypothetical calculations. We reject the Commission's hypothetical calculations for the same reasons that it rejected the Staff's hypothetical calculations.

The purpose of the Program was to stabilize natural gas prices. To achieve this purpose, the Program had two incentive components: (1) price protection, and (2) cost reduction. The plain and ordinary meaning of the tariff indicates that despite Laclede's rightful decision to opt out of the price protection component in light of unprecedented increases in natural gas prices, the cost reduction component remained viable. The customers continued to benefit from the cost reduction component of the Program. This is confirmed by the explicit language in the Stipulation and Agreement that except for the elimination of the 70% coverage requirement and Laclede's decision to opt out of the Price Protection incentive, "*all* remaining provisions of the existing PSP currently in effect will remain in full force and effect." (Emphasis added.) The Commission's attempts to harmonize this explicit language of the Stipulation and Agreement with its legal conclusion that the parties did not intend for the Overall Cost Reduction Incentive to persist are unpersuasive. The PSP Tariff is clear and unambiguous and cannot be given another meaning by the Commission's hypothetical envisioning of an "illogical result."

The Commission fails to cite any evidence in its Order or in its brief on appeal supporting a finding that there was an "unlikely and unfair outcome" or that the profits realized by Laclede were merely "illusory." In fact, the actual evidence presented in the case supports the opposite conclusion, i.e. that Laclede did not take advantage of any "perverse incentive" to conduct only intermediate trading so it could share in the profits under the Overall Cost Reduction Incentive. Both Laclede and the Staff agreed that the Overall Cost Reduction Incentive remained after Laclede opted out of the Price Protection Incentive. During the 2000–2001 heating season at issue, Laclede realized total gains of approximately $33.5 million from options trading. $11.5 million of the gains was realized from the sale of call options during the last three business days of NYMEX trading—the period of trading subject to the Price Protection Incentive. Because Laclede had opted out of the Price Protection Incentive, it immediately flowed through to its customers the entire $11.5 million. Laclede sought only to retain $4.9 million of the $17 million it realized from intermediate trading, which the Commission acknowledged it was entitled to under the plain language of the tariff.

## Conclusion

Under the plain language of the PSP Tariff and the compliance tariff implementing the Stipulation and Agreement, the Overall Cost Reduction Incentive remained operable during the 2000–2001 heating season. Thus, Laclede was entitled to retain the $4.9 million of proceeds.

We affirm the circuit court's judgment reversing the Commission's Report and Order and remand to the circuit court with directions to remand this cause to the Commission for further proceedings consistent with this opinion.

ULRICH and BRECKENRIDGE, JJ., concur.