STATE ex rel. UNION ELECTRIC
COMPANY d/b/a Ameren
Missouri, Respondent,

v.

PUBLIC SERVICE COMMISSION OF
the STATE of Missouri, Appellant,

Missouri Industrial Energy
Consumers, Appellant.

Nos. WD 75403, WD 75404.

Missouri Court of Appeals,
Western District.

May 14, 2013.

James B. Lowery, Columbia, MO and Thomas M. Byrne, St. Louis, MO, for respondent Union Electric Company d/b/a Ameren Missouri.

Shelley E. Brueggemann, Jefferson City, MO, for appellant Public Service Commission.

Brent E. Roam, St. Louis, MO, for appellant Missouri Industrial Energy Consumers.

Before Division Three: CYNTHIA L. MARTIN, Presiding Judge, JOSEPH M. ELLIS, Judge and GARY D. WITT, Judge.

CYNTHIA L. MARTIN, Judge.

Union Electric Company d/b/a Ameren Missouri ("Ameren") appeals from the Public Service Commission's ("PSC") report and order that required Ameren to refund $17,169,838 to its ratepayers following prudence review of a rate adjustment under a fuel adjustment clause. The PSC concluded that Ameren acted imprudently, improperly, and unlawfully in failing to treat revenues it received from two power sales contracts as off-system sales for purposes of calculating the rate adjustment. Ameren argues that the PSC erroneously interpreted the definition of "off-system sales" in the fuel-adjustment clause. Ameren also argues that the PSC inappropriately ordered refunds because Ameren did not act imprudently and Ameren's ratepayers were not harmed by its failure to classify two power sales contracts as off-system sales. On writ of review, the circuit court of Cole County reversed the PSC's determination.

Because we conclude that the fuel adjustment clause required Ameren to treat revenues it received from two power sales contracts as off-system sales and because we conclude that Ameren's failure to treat those revenues as off-system sales was imprudent and harmed ratepayers who were required to pay higher rates than permitted by the fuel adjustment clause, we reverse the judgment of the circuit court and affirm the PSC's report and order.

## Background

### Ameren's 2008 General Rate Case

On April 4, 2008, Ameren filed tariff sheets and supporting testimony with the

PSC to initiate a general rate increase case, PSC Case Number ER–2008–0318 ("2008 general rate case"). The tariff sheets proposed the implementation of a fuel adjustment clause, as authorized by section 386.266.[1] A fuel adjustment clause permits electric utilities to adjust base rates periodically outside a general rate proceeding "to reflect increases and decreases in an electric utility's prudently incurred fuel and purchased power costs." 4 C.S.R. 240–20.090(1)(C). The parties to the 2008 general rate case included Ameren, the PSC Staff, and Missouri Industrial Energy Consumers ("MIEC"). Though these parties did not agree that Ameren should be permitted a fuel adjustment clause, they did stipulate to agreed language should a fuel adjustment clause be approved by the PSC.

On January 27, 2009, the PSC entered a report and order approving the tariff sheets ("Ameren tariff") in the 2008 general rate case. The PSC's report and order approved a fuel adjustment clause in the form stipulated by the parties. The PSC added a 95/5 percent sharing mechanism to the fuel adjustment clause.[2] As a result, 95 percent of any interim rate adjustment calculated under the fuel adjustment clause would be passed through to ratepayers, and 5 percent would be absorbed or retained by Ameren. The tariff sheets were to take effect (and did take effect) on March 1, 2009.

The report and order in the 2008 general rate case set base rates for Missouri retail customers at a level intended to generate the revenue necessary to cover Ameren's fixed and variable costs and to provide a return on investment.[3] The base rates presumed certain levels of electricity consumption (also known as "load") for Ameren's Missouri retail customers, the largest of which is Noranda Aluminum, Inc. ("Noranda"). Noranda operates an aluminum smelter and consumes more power than any other Ameren customer—approximately 9–10 percent of Ameren's anticipated retail load.

### Ameren's Fuel Adjustment Clause

Ameren's fuel adjustment clause provided that in each accumulation period,[4] 95 percent of the difference between "Actual Net Fuel Costs" and "Net Base Fuel Costs" would be reflected as a fuel adjustment credit or debit on ratepayers' bills. Generally, "Net Base Fuel Costs" were defined in the tariff as Ameren's base fuel and purchased power costs reduced or offset by Ameren's base off-system sales revenue, and "Actual Net Fuel Costs" were defined in the tariff as Ameren's actual fuel and purchased power costs incurred in an accumulation period reduced or offset by off-system sales revenues received in an accumulation period. "Fuel costs" were defined in the tariff, in pertinent

1. The statutory reference to section 386.266 is to RSMo Cum.Supp.2010. All other statutory references are to RSMo 2000 unless otherwise indicated.

2. A "sharing mechanism" refers to the percentage of increased or decreased costs calculated through the fuel adjustment clause to be passed on to ratepayers. A sharing mechanism is a recognized means "to provide the electrical corporation with incentives to improve the efficiency and cost-effectiveness of its fuel and purchased power procurement activities." Section 386.266.1; *State ex rel.*

*Noranda Aluminum, Inc. v. Pub. Serv. Comm'n,* 356 S.W.3d 293, 314 (Mo.App. S.D. 2011).

3. Fixed costs are a relative constant and are generally not affected by electricity consumption. Variable costs refer primarily to the cost of fuel and purchased power.

4. Ameren's fuel adjustment clause described three accumulation periods, each four months in length. A fuel adjustment was required for each accumulation period.

part, as fuel or purchased power costs "incurred to support sales to all [Missouri] retail customers and Off–System Sales allocated to Missouri retail electric operations." Ameren's fuel adjustment clause thus "reflected" off-system sales, meaning that off-system sales revenues and associated costs were factors in the fuel adjustment calculation.[5]

Where off-system sales and associated costs are reflected in a fuel adjustment clause formula, actual fuel costs are reduced by off-system sales to calculate net fuel costs because the utility's fixed costs (which permit off-system sales to be generated) are paid by retail ratepayers. *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n,* 274 S.W.3d 569, 585 (Mo.App. W.D.2009). In operation, where a fuel adjustment clause formula reflects off-system sales and associated costs, the electric utility will benefit from increased rates if fuel costs rise *or* if off-system sales drop, but ratepayers will benefit from decreased rates if fuel costs drop *or* if off-system sales increase.

Typically, revenues received by an electric utility are either retail sales revenues (sales to ratepayers) *or* off-system sales revenues (sales to other than ratepayers). 4 CSR 240–20.090(1)(B); *Public Counsel,* 274 S.W.3d at 585 (observing that electric utilities sell most of their electricity to retail customers and that any unused electricity is sold to "off-system buyers"). The Ameren tariff defined "off-system sales" in a manner that differed from the typical definition. The tariff defined off-system sales as follows:

> Off–System Sales shall include all sales transactions . . . excluding Missouri re-

tail sales *and long-term full and partial requirements sales . . . .*

(Emphasis added.) The exclusion of retail sales from this definition reflected nothing more than the fact that all non-retail sales are off-system sales. *See Public Counsel,* 274 S.W.3d at 585. However, the further exclusion of "long-term full and partial requirements sales" from the definition of "off-system sales" was of material import. The exclusion operated to remove a category of "off-system sales" from consideration in calculating fuel adjustments. Stated differently, but for the exclusion of "long-term full and partial requirements sales," such sales would have been off-system sales required to pass through the fuel adjustment clause subject to the 95/5 percent sharing mechanism. The atypical definition of "off-system sales" permitted Ameren to keep 100 percent of the revenues from "long-term full and partial requirements sales," instead of requiring Ameren to subtract the revenues from actual fuel costs to calculate net fuel costs.

Despite the Ameren tariff's exclusion of "long-term full and partial requirements sales" from the definition of "off-system sales," and thus from consideration in applying the fuel adjustment clause formula, the phrase *was not defined.*

### The Ice Storm

On January 28, 2009, one day after the PSC approved the Ameren tariff, an ice storm struck Ameren's service territory in southeast Missouri. Ninety-five percent of Ameren's retail customers in six counties, including Noranda, lost service. Thousands of Ameren-owned electric poles were destroyed. Because of the loss of service, molten aluminum hardened in Noranda's

---

**5.** As we discuss in greater detail *infra,* fuel adjustment clauses "may or may not include off-system sales revenues and associated costs." 4 CSR 240–20.090(1)(C). Here, Ameren's fuel adjustment clause clearly included off-system sales, as "fuel costs" were defined to include fuel costs to generate off-system sales and as off-system sales revenues were a factor in the fuel adjustment formula.

production lines. The aluminum had to be removed with a jack hammer. There was no way to determine when Noranda would return to full service, though it was expected to take at least a year. Noranda's electricity consumption (load) decreased by approximately two-thirds. As a result, retail revenue that had been presumed in setting Ameren's base rates in the 2008 general rate case was unexpectedly lost,[6] while Ameren's fixed costs over the same period were not expected to change.

Because the report and order in the 2008 general rate case was not final,[7] Ameren filed a request for rehearing with the PSC. Ameren asked "that the [PSC] alter the terms of the fuel adjustment clause tariff to exclude revenues from all incremental off-system sales resulting from the loss of the Noranda load from being credited to customers under the fuel adjustment clause."[8] In other words, Ameren sought to sell the unused Noranda retail load off-system and to retain 100 percent of the revenues, even though the revenues would otherwise have been required to pass through the fuel adjustment clause subject to the 95/5 percent sharing mechanism. Ameren argued that this would keep "both customers and Ameren [ ] in precisely the

same position that they would have been in had the ice storm and the consequent loss of Noranda's load not occurred"[9] because Ameren would be treating the revenue the same as if it been received as retail revenue from Noranda. Ameren argued that without a temporary modification to its fuel adjustment clause, its off-system resale of Noranda's load would "credit[ ] [retail] customers with [95 percent of] the revenues from those sales ... an enormous windfall occasioned by an Act of God, [while] Ameren [would] experienc[e] an equally enormous under-collection of its costs."[10]

"[I]n an order dated February 19, 2009 the [PSC] denied Ameren['s] request stating: 'If the [PSC] were to grant [Ameren's] application for rehearing it would have to set aside the approved stipulation and agreement regarding the fuel adjustment clause, reopen the record to take evidence on the appropriateness of the proposed change, and make a decision before the March 1, 2009 operation of law date. Such action is obviously impossible.' "[11]

The PSC's report and order approving the Ameren tariff thereafter proceeded

---

6. Ameren suggests this revenue was $90 million annually.

7. At the time of the ice storm, the report and order in the 2008 general rate case remained subject to motions for rehearing and ultimately to appellate review.

8. Pre-filed testimony of Lynn M. Barnes, Ameren's Vice–President, Business Planning and Controller. Ameren's Application for Rehearing is not in the legal file. Rule 81.12(a) requires the legal file to contain "all of the record, proceedings and evidence necessary to the determination of all questions to be presented, by either appellant or respondent." The PSC included the Application for Rehearing in its appendix, which is not a part of the legal file. *See In re T.C.T.*, 165 S.W.3d 529, 531 n. 2 (Mo.App. W.D.2005). Thus, any

discussion in this Opinion about the Application for Rehearing or the PSC's response to the Application for Rehearing is limited to information contained in the record on appeal.

9. Pre-filed testimony of Lynn M. Barnes, Ameren's Vice–President, Business Planning and Controller.

10. *Id.*

11. *Id.* The PSC's order denying the Application for Rehearing is not in the legal file, but was included in PSC's appendix. For the reasons previously described, *supra* note 8, we do not rely on the order as it appears in the PSC's appendix but rely only on what appears in the record on appeal.

through appellate review and was affirmed in *State ex rel. Noranda Aluminum, Inc. v. Public Service Commission,* 356 S.W.3d 293 (Mo.App. S.D.2011). The parties who stipulated to the language for the fuel adjustment clause did not appeal. Rather, Noranda, which had intervened in the 2008 general rate case, was the primary appellant. *Id.* at 297. Noranda challenged the Ameren tariff, including the fuel adjustment clause. *Id.* at 296. The Southern District found Ameren's fuel adjustment clause to be lawful and reasonable.[12] *Id.* at 312–15. However, the Southern District was *not* asked to review the lawfulness or reasonableness of the definition of "off-system sales" in the Ameren tariff. Nor was the Southern District asked to review the PSC's refusal to permit Ameren to temporarily modify the fuel adjustment clause to address the unexpected loss of the Noranda load.

### The Power Sales Contracts

In the spring of 2009, after the PSC denied Ameren's request for rehearing, Ameren entered into two contracts to sell the unused Noranda load. One contract was with AEP Operating Companies ("AEP") and required Ameren to provide 100 megawatts of power for fifteen months. AEP is an integrated electric utility serving retail customers in eleven states. The other contract was with Wabash Valley Power Association, Inc. ("Wabash") and required Ameren to provide 150 megawatts of power for eighteen months. Wabash is a generation and transmission cooperative that procures power for its distribution cooperative members. Jaime Haro ("Haro"), the Director of Asset Management and Trading for Ameren, testified that Ameren crafted

the AEP and Wabash contracts so they could be characterized as "long-term full or partial requirement sales" contracts. In fact, "[t]he amount of power to be sold under the two contracts over their combined duration was designed to approximate what Ameren believed would be the lost sales to Noranda." [Ameren Brief, pp. 9–10.] Ameren believed this would permit it to retain 100 percent of the revenues from the contracts with no obligation to offset the revenue against actual fuel costs in calculating rate adjustments under the fuel adjustment clause. According to Ameren, the "contracts simply allowed Ameren [ ] to recover costs that had previously been allocated to Noranda sales." [13] So viewed, the contracts afforded Ameren the same relief Ameren had unsuccessfully sought in its request for rehearing.

When Ameren calculated interim rate adjustments for the first and second accumulation periods under the fuel adjustment clause, Ameren did not treat the AEP and Wabash contract revenues as off-system sales and instead classified the revenues as longterm partial requirements sales. Thus, Ameren retained 100 percent of those revenues and did not reduce its actual fuel costs by the revenues before calculating ratepayers' rate adjustments.

The fuel-adjustment clause in the Ameren tariff provided that "[p]rudence reviews of the costs subject to this [fuel adjustment clause] shall occur no less frequently than every eighteen months," a requirement of section 386.266.4(4) and 4 CSR 240–20.090(7). The PSC Staff initiated its first prudence review of Ameren's rate adjustments under the fuel adjustment clause in March 2010. The prudence review cov-

---

**12.** The challenges to the reasonableness of the fuel adjustment clause at issue in *Noranda Aluminum* are not material to the issues presented in this appeal.

**13.** Pre-filed testimony of Lynn M. Barnes, Ameren's Vice–President, Business Planning and Controller.

ered the first two accumulation periods.[14] In its August 31, 2010 report, the PSC Staff concluded that it was "prudent" for Ameren to enter into the AEP and Wabash contracts. However, the PSC Staff determined that it was "imprudent" for Ameren to characterize those contracts as "long-term full and partial requirements sales" instead of "off-system sales." The PSC Staff concluded:

> Given the [PSC's decision] ... not to modify [the fuel-adjustment clause] due to the loss of Noranda's load, it would be imprudent not to treat the revenues from the sales of energy that became available due to the loss of the Noranda load as off-system sales revenues under [the fuel-adjustment clause]. Therefore, [Ameren] was imprudent in not including the costs and revenues associated with the AEP and [Wabash] contracts in the [rate-adjustment] calculations....

The PSC Staff proposed that Ameren refund its retail customers $24,073,236 but later corrected its calculation to require that Ameren refund its retail customers $17,169,838. Ameren disputed the PSC Staff's findings and requested a hearing in front of the PSC.

The PSC held a two-day hearing during which Ameren, the PSC Staff, and MIEC presented evidence.[15] The central issue before the PSC was whether the AEP and Wabash contracts were "long-term full and partial requirements sales" properly excluded from consideration under the fuel adjustment clause.

On April 27, 2011, the PSC issued a report and order ("Order") which concluded that "the Wabash and AEP contracts are not long-term full or partial requirements contracts as defined by [the Ameren] tariff." The PSC thus concluded that, by failing to treat the revenues from the Wabash and AEP contracts as off-system sales and by failing to subtract the revenues from actual fuel and purchase power costs in calculating a rate adjustment under the fuel adjustment clause, Ameren "acted contrary to the requirements of its tariff and therefore acted inappropriately." The PSC ordered Ameren to refund $17,169,838 to its ratepayers, the rate adjustment that would have been calculated had Ameren treated the AEP and Wabash contract revenues as "off-system sales" during the applicable accumulation periods.

Ameren filed a petition for writ of review in the circuit court of Cole County. The circuit court reversed the PSC's Order and concluded that the definition of "long-term full and partial requirements sales" encompassed the AEP and Wabash contracts.

The PSC and MIEC appeal. Pursuant to Rule 84.05(e), the briefing schedule is reversed, and Ameren, as the party aggrieved by the PSC's Order, is treated as the appellant.

### Summary of Issues on Appeal

Ameren raises three points on appeal. First, Ameren argues that the PSC's interpretation of the phrase "long-term full and partial requirements sales" to exclude the AEP and Wabash contracts is unlawful because the PSC failed to properly apply tariff application principles to conclude that the AEP and Wabash contracts were

---

14. Per the Ameren tariff, this was the period of February 2009 through September 2009. Because the tariff did not take effect until March 1, 2009, the first accumulation period was three, not four, months in length.

15. Missouri Retailers Association and the Office of Public Counsel also participated in the hearing. They are not parties to this appeal, so they have been omitted from further discussion in this opinion.

not long-term full and partial requirements sales. Second, Ameren contends that it was unlawful for the PSC to order refunds because Ameren did not act unreasonably and its actions did not harm ratepayers. Third, Ameren argues that the PSC erred in concluding that Ameren acted imprudently in treating the AEP and Wabash contracts as long-term partial requirements sales because its decision was not supported by competent and substantial evidence on the record and was an abuse of discretion.

The first point relied on focuses on the proper construction of the phrase "long-term full and partial requirements sales" in the Ameren tariff. The second and third points relied on address the lawfulness and/or reasonableness of the PSC's "imprudence" determination. We discuss the points in the order raised.

## Point I

### *Standard of Review*

■ On appeal, we review the PSC's Order, not the judgment of the circuit court reversing the Order. *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 328 S.W.3d 347, 351 (Mo.App. W.D.2010). The burden of proof is on Ameren, as the party adverse to the PSC's Order, "to show by clear and satisfactory evidence that the determination, requirement, direction or order of the [PSC] complained of is unreasonable or unlawful." Section 386.430; *see also State ex rel. Laclede Gas Co. v. Pub. Serv. Comm'n*, 328 S.W.3d 316, 318 (Mo. App. W.D.2010); *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n*, 186 S.W.3d 376, 381–82 (Mo.App. W.D.2005).

■ "Lawfulness is determined by whether or not the [PSC] had the statutory authority to act as it did." *Laclede Gas Co.*, 328 S.W.3d at 318. If the PSC reaches a legal conclusion regarding its statuto-

ry authority, we review that legal conclusion under the lawfulness prong of our standard of review. *State ex rel. Laclede Gas Co. v. Pub. Serv. Comm'n*, 156 S.W.3d 513, 521 (Mo.App. W.D.2005) (holding that in reviewing the lawfulness of a PSC order, "we would only review an erroneous interpretation of law governing the [PSC's] statutory authority.").

■ "Reasonableness depends on whether or not '(i) the [PSC's] order is supported by substantial and competent evidence on the whole record, (ii) the decision is arbitrary, capricious or unreasonable, or (iii) the [PSC] abused its discretion.' " *Laclede Gas Co.*, 328 S.W.3d at 318 (quoting *Mo. Gas Energy*, 186 S.W.3d at 382).

Here, the parties disagree about our standard of review. Ameren argues that the PSC erred as a matter of law in its interpretation of the fuel adjustment clause requiring *de novo* review under the lawfulness prong. PSC and MIEC argue that we are required to review the PSC's interpretation of the fuel adjustment clause under the reasonableness prong because we afford deference to the PSC's interpretation of its own orders. Both parties are partially correct. In this case, because the PSC has interpreted a tariff, we initially review the PSC's interpretation *de novo*, although we conduct that review under the reasonableness prong.

■ As observed, the lawfulness prong is reserved to "determine ... whether or not the PSC had the statutory authority to act as it did." *State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 331 S.W.3d 677, 682 (Mo.App. W.D.2011). Ameren does not challenge the PSC's statutory authority to conduct prudence reviews of rate adjustments calculated under fuel adjustment clauses or its authority to interpret a tariff as a part of such a review. In

fact, the PSC is required, not merely authorized, to conduct prudence reviews of rate adjustments under fuel adjustment clauses. Section 386.266.4(4). Moreover, the PSC has the authority to interpret and apply provisions in a tariff. *State ex rel. Mo. Pipeline Co. v. Pub. Serv. Comm'n*, 307 S.W.3d 162, 177 (Mo.App. W.D.2009). The lawfulness prong of our standard of review is not implicated by Ameren's first point relied on. Thus, our review of the PSC's interpretation of the Ameren tariff must be conducted under the reasonableness prong. *Laclede Gas Co.*, 156 S.W.3d at 521 (holding that we review legal conclusions reached by the PSC on issues other than its statutory authority under the reasonableness prong).

However, the PSC and MIEC are not correct when they argue that we are always required to afford deferential review to the PSC's construction of a tariff under the reasonableness prong. The PSC's reliance on *State ex rel. Beaufort Transfer Co. v. Public Service Commission*, 610 S.W.2d 96 (Mo.App. W.D.1980), is misplaced. In *Beaufort*, we indeed held that "[t]he [PSC] is entitled to interpret its own orders and to ascribe to them a proper meaning and, in so doing, the [PSC] does not act judicially but as a fact-finding agency." *Id.* at 100 (citing *State ex rel. Mo. Pac. Freight Transp. Co. v. Pub. Serv. Comm'n*, 312 S.W.2d 363 (Mo.App.1958); *State ex rel. Orscheln Bros. Truck Lines v. Pub. Serv. Comm'n*, 232 Mo.App. 605, 110 S.W.2d 364 (1937)); *see also State ex rel. Laclede Gas Co. v. Pub. Serv. Comm'n*, 392 S.W.3d 24, 36 (Mo.App. W.D.2012) (noting that the PSC is entitled to inter-

pret its own orders, including an order that constituted a stipulated agreement by the parties). We generally do not substitute our judgment for the PSC's when it acts as a fact-finder because we tend to defer to the PSC on matters that are within the realm of the PSC's expertise. *See Mo. Gas Energy*, 186 S.W.3d at 382.

However, a tariff is unique as, unlike other PSC orders, a tariff has the same force and effect as a statute passed by the legislature. *Laclede Gas Co.*, 156 S.W.3d at 521 ("Once the [PSC] approved [the Ameren tariff containing the fuel-adjustment clause], it became Missouri law."). A tariff also partakes partially of a contract as it is generally the subject of some negotiation between the PSC, the utility, and impacted constituent groups. As such, our review of the PSC's construction of tariffs is potentially blended. We review the PSC's interpretation of an unambiguous tariff *de novo* in the same manner that we would review a trial court's interpretation of a statute. *Id.*[16] *State ex rel. Associated Natural Gas Co. v. Pub. Serv. Comm'n*, 37 S.W.3d 287, 293 (Mo. App. W.D.2000). *De novo* review similarly applies to review the PSC's determination of whether a tariff applies to a given set of facts. *Cf. McKinney v. State Farm Mut. Ins.*, 123 S.W.3d 242, 245 (Mo.App. W.D. 2003) ("Whether a statute applies to a given set of facts is ... a question of law."). If a tariff is ambiguous, however, such that its intended meaning cannot be definitively resolved by the language of the tariff itself, we will apply traditional rules of "statutory" construction, and review the

**16.** Though it has been said that "[t]he interpretation and construction of a statute by an agency charged with its administration is entitled to great weight," *Foremost–McKesson, Inc. v. Davis*, 488 S.W.2d 193, 197 (Mo. banc 1972), "[n]onetheless, this Court exercises independent judgment and must correct erroneous interpretations of law." *State ex rel. Sprint Mo., Inc. v. Pub. Serv. Comm'n*, 165 S.W.3d 160, 164 (Mo. banc 2005). That is because the PSC is not a court and does not exercise judicial power or authority. *Gaines v. Gibbs*, 709 S.W.2d 541, 543 (Mo.App. S.D. 1986).

PSC's resort to evidence of the tariff's intended meaning [17] as a factual determination entitled to deference. *See Associated Natural Gas,* 37 S.W.3d at 293–94.

Thus, the PSC's interpretation and construction of the Ameren tariff is a question of law that we review *de novo* under the reasonableness prong if the tariff is unambiguous. *Hassan v. Div. of Employment Sec.,* 389 S.W.3d 290, 292 (Mo.App. W.D.2013); *Laclede Gas Co.,* 156 S.W.3d at 521. This standard of review is consistent with the oft-cited principle that we review *all* legal issues presented by a PSC order *de novo. See State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n,* 120 S.W.3d 732, 734 (Mo. banc 2003) ("[A]ll legal issues are reviewed *de novo.*"); *Laclede Gas Co.,* 156 S.W.3d at 521. When *de novo* review of a legal issue is conducted under the reasonableness prong, a finding of error is tantamount to a finding that the PSC's order is both unreasonable and an abuse of discretion. *See Bohrn v. Klick,* 276 S.W.3d 863, 865 (Mo.App. W.D.2009) ("[T]he trial court necessarily abuses its discretion where its ruling is based on an erroneous interpretation of the law."). If Ameren's tariff is ambiguous, however, we review the PSC's resolution of the ambiguity under the reasonableness prong to determine whether the finding is supported by substantial and competent evidence on the whole record. *Laclede Gas Co.,* 328 S.W.3d at 318.

With this standard of review in mind, we consider the competing interpretations of the phrase "long-term full and partial requirements sales" offered by the parties, and we review the PSC's conclusion that the phrase does not include the AEP and Wabash contracts within its scope.

*Analysis*

(i) **The Parties' Competing Interpretations of the Phrase "Long–Term Full and Partial Requirements Sales"**

In the hearing before the PSC, the parties urged divergent definitions for the phrase "long-term full and partial requirements sales." The competing definitions differed based loosely on perspective. Ameren sought to define the phrase in a wholesale electric market context. The PSC Staff and MIEC sought to define the phrase in a traditional regulatory context.

Ameren argued that "long-term" in the wholesale electric market means one year or more. The PSC Staff and MIEC offered inconsistent evidence on the meaning of longterm, though MIEC insisted that under FERC [18] guidelines, "long-term" in a regulatory context is five years or more.

Ameren argued that "requirements sales" in the wholesale electric market means power needed to meet the ***purchaser's*** load servicing obligations. Thus, because the AEP and Wabash contracts permitted the purchasers to partially satisfy load obligations to their customers, the contracts were "requirements sales." The PSC Staff and MIEC argued that in the regulatory context, "requirements" contracts are viewed from the ***seller's*** perspective, such that the obligation to sell power has been incorporated into the seller's resource planning. In other words, "long-term full and partial requirements sales" represent ongoing obligations on the part of the utility to provide power, requiring the utility to plan for servicing the obligation. Consistent with this view, the PSC Staff presented evidence of four contracts between Ameren and certain munic-

---

17. Such evidence might include, for example, negotiating history, surrounding circumstances, industry practice, and expert testimony.

18. Federal Energy Regulatory Commission

ipalities that were in existence when Ameren opened the 2008 general rate case. The existing municipal contracts ranged in length from twenty-nine months to five years and had been included in Ameren's resource planning. The PSC Staff argued that it was these existing contracts which prompted Ameren to request exclusion of "long-term full and partial requirements sales" from the definition of "off-system sales" in the fuel adjustment clause.[19] According to the PSC, only contracts with commensurate qualities could fall within the definition of "long-term full and partial requirements sales," and because the AEP and Wabash contracts did not possess commensurate qualities, they were not longterm full or partial requirements sales.

### (ii) The PSC's Construction of the Phrase "Long–Term–Full and Partial Requirements Sales"

The PSC concluded that the phrase "long-term full and partial requirements sales" must be read and interpreted as a whole and not artificially broken into the component phrases "long-term" and "full and partial requirements sales." The PSC's Order concluded that the phrase, read as a whole, referred to contracts similar to the four municipal "requirements services" contracts Ameren had in place when the 2008 general rate case was opened. The PSC found that these contracts required Ameren to provide services to the municipalities on an ongoing basis, necessitating consideration of the service obligation in Ameren's resource planning. The PSC found that the unique nature of these municipal contracts prompted Ameren to request exclusion of "long-term full and partial requirements sales" from the definition of "off-system sales" in its fuel adjustment clause. The PSC found that it

made sense to exclude the existing municipal contracts from consideration under the fuel adjustment clause because Ameren's "costs [to produce the power to meet its obligations under the existing municipal contracts] were allocated to municipal utilities through energy and demand allocators," and that as a result, Ameren's "costs to provide wholesale service to municipalities [would not be] flowed through the Fuel Adjustment Clause [rendering it] inappropriate to flow the revenues received from the municipalities through the Fuel Adjustment Clause." The PSC concluded that when it approved the fuel adjustment clause, it intended the phrase "long-term full and partial requirements sales" to be limited in its meaning to municipal contracts like the four in place when the Ameren tariff was approved. The PSC found that the AEP and Wabash contracts were not similar to the existing municipal contracts and that the contracts were not "long-term full or partial requirements sales."

### (iii) The Rules of Statutory Construction Applicable to Our *De Novo* Review of the PSC's Determination

We review the PSC's legal construction of the Ameren tariff *de novo*. Because the Ameren tariff has the force and effect of a statute, we apply traditional principles of statutory interpretation to determine the meaning of the phrase "long-term full and partial requirements sales." *Laclede Gas Co.*, 156 S.W.3d at 521.

 When interpreting a statute, we begin with the language chosen by the legislature. " 'If the intent of the legislature is clear and unambiguous, by giving the language used in the statute its plain and ordinary meaning, then we are bound

---

**19.** The revenue from the four existing municipal contracts was excluded from treatment as off-system sales by Ameren in its first rate adjustment under the fuel adjustment clause without objection during the PSC Staff's prudence review.

by that intent and cannot resort to any statutory construction in interpreting the statute.'" *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 455 (Mo. banc 2011) (quoting *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 166 (Mo.App. W.D.2006)).

> The rules of statutory interpretation are not intended to be applied haphazardly or indiscriminately to achieve a desired result. Instead, the canons of statutory interpretation are considerations made in a genuine effort to determine what the legislature intended. This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue.

*Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009).

■ Applied to a tariff, the aforesaid principles of statutory interpretation require us to "'ascertain the intent of [the PSC] from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning.'" *Laclede Gas Co.*, 156 S.W.3d at 521 (quoting *Wolff Shoe Co. v. Dir. of Revenue*, 762 S.W.2d 29, 31 (Mo. banc 1988)).

■ For words used in a statute or a tariff to have plain and ordinary meaning, the words must be "plain and clear to a person of ordinary intelligence." *State v. Daniel*, 103 S.W.3d 822, 826 (Mo.App. W.D.2003). "A statute [or tariff] is ambiguous if the language is subject to more than one reasonable interpretation." *State v. Barraza*, 238 S.W.3d 187, 192 (Mo.App. W.D.2007).

The phrase "long-term full and partial requirements sales" is not defined in the Ameren tariff. In the hearing before the PSC, all parties took the position that the phrase is ambiguous. The parties spent two days before the PSC presenting competing evidence about the meaning of the phrase. The evidence included technical testimony and documents addressing how words in the phrase are used in the industry. The parties' evidence indicates the phrase is susceptible to divergent meanings with respect to when a contract is "long-term" and whether "requirements sales" refers to a power purchaser's obligation to meet customer needs or to a utility's obligation to generate power it has contracted to sell.

■ The PSC's Order concluded that the phrase "long-term full and partial requirements sales" is ambiguous. We are not bound by the parties' uncontested attribution of ambiguity or by the PSC's determination of ambiguity. *See, e.g., Lincoln Indus., Inc. v. Dir. of Revenue*, 51 S.W.3d 462, 465 (Mo. banc 2001). In this case, however, we agree with the parties and the PSC. The phrase "long-term full and partial requirements sales" is ambiguous. The phrase "long-term full and partial requirements sales" does not possess a meaning that is "plain and clear to a person of ordinary intelligence." *See Daniel*, 103 S.W.3d at 826. As a result, we must resort to rules of statutory construction to determine the meaning of "long-term full and partial requirements sales," with the PSC's objective in mind. *See Brown v. Brown*, No. ED98353, — S.W.3d —, —, 2012 WL 6688107, at *3 (Mo.App. E.D. Dec. 26, 2012) ("The rules of statutory construction require that we reasonably interpret the statute with the legislative objective in mind.").

■ The parties urge that we must discern the intended meaning of words or phrases in the Ameren tariff for which no "statutory" definition has been provided by resort to dictionary or industry definitions. *See, e.g., State ex rel. Burns v. Whittington*, 219 S.W.3d 224, 225 (Mo. banc 2007). However, this rule of statutory interpreta-

tion is tempered by the overriding rule that "construction of a statute should avoid unreasonable or absurd results." *Aquila Foreign Qualifications Corp. v. Dir. of Revenue*, 362 S.W.3d 1, 4 (Mo. banc 2012). Here, surprisingly, the parties' competing arguments about the proper dictionary or industry definitions for terms used in the phrase "long-term full and partial requirements contracts" completely ignores that the PSC's authority to adopt (and thus to interpret) fuel adjustment clauses is controlled by statute.[20] Thus, before we resort to dictionary and industry definitions to determine the meaning of terms not defined in the Ameren tariff, we must first appreciate the constraints imposed by the legislature on the PSC with respect to approval and interpretation of fuel adjustment clauses.

Prior to the enactment of section 386.266, the PSC had no authority to include fuel adjustment clauses in electric utility tariffs. *State ex rel. Util. Consumers Council of Mo., Inc. v. Pub. Serv. Comm'n*, 585 S.W.2d 41 (Mo. banc 1979). In *Utility Consumers Council*, our Missouri Supreme Court observed that "[a] fuel adjustment clause . . . enables the utility to pass on to the consumer an increase (or decrease) in the cost of fuel automatically. . . . As such, it is a radical departure from the usual practice of approval or disapproval of filed rates, in the context of a general rate case." *Id.* at 49. After exhaustively analyzing proffered statutes argued to empower the PSC to approve fuel adjustment clauses, the Supreme Court concluded that the PSC was not authorized by the legislature to approve fuel adjustment clauses. *Id.* at 51–57. The Court observed: "If the legislature wishes to approve automatic adjustment clauses, it can of course do so by amendment of the statutes, and set up appropri-

ate statutory checks, safeguards, and mechanisms for public participation." *Id.* at 57.

In 2005, the legislature enacted section 386.266, which authorized the PSC to approve fuel adjustment clauses. Section 386.266.1 provides that "any electric corporation may make application to the [PSC] to approve rate schedules authorizing an interim energy charge, or periodic rate adjustments outside of general rate proceedings *to reflect increases and decreases in its prudently incurred fuel and purchased-power costs.*" (Emphasis added.) The legislature also authorized the PSC to promulgate regulations "to govern the structure, content and operation of such rate adjustments." Section 386.266.9.

Fuel adjustment clauses are thus purely statutory creatures. The PSC's "powers are limited to those conferred by . . . statute[ ], either expressly, or by clear implication as necessary to carry out the powers specifically granted." *Util. Consumers Council*, 585 S.W.2d at 49. Applied here, the PSC's power to approve or interpret a fuel adjustment clause is necessarily constrained by the authority described in section 386.266.1 and by the regulations promulgated pursuant to the authority of section 386.266.9. If a fuel adjustment clause as approved or subsequently interpreted exceeds the authority extended by section 386.266 or by the promulgated regulations, then it is unlawful under the rationale set forth in *Utility Consumers Council*.

Thus, the overriding rule of statutory construction we are to apply in this case is the rule which requires us "to construe legislative enactments so as to render them constitutional and avoid the effect of unconstitutionality, if it is reason-

---

20. Section 386.266.

ably possible to do so." *Simpson v. Kilcher,* 749 S.W.2d 386, 390 (Mo. banc 1988), *overruled on other grounds by Kilmer v. Mun,* 17 S.W.3d 545 (Mo. banc 2000). "It is a well accepted canon of statutory construction that if one interpretation of a statute results in the statute being constitutional while another interpretation would cause it to be unconstitutional, the constitutional interpretation is presumed to have been intended." *Blaske v. Smith & Entzeroth, Inc.,* 821 S.W.2d 822, 838–39 (Mo. banc 1991). Applied to the Ameren tariff, this rule of statutory construction requires us to construe the phrase "long-term full and partial requirements sales" to avoid rendering the fuel adjustment clause unlawful. *State ex rel. Springfield Warehouse & Transfer Co. v. Pub. Serv. Comm'n,* 240 Mo.App. 1147, 225 S.W.2d 792, 794 (1949) ("[The PSC] has no power to adopt a rule, or follow a practice, which results in nullifying the expressed will of the Legislature."). We must presume, therefore, that the PSC approved and subsequently interpreted the fuel adjustment clause intending that its operation would fall within the parameters of statutory constraint. *Cf. State ex rel. Anderson v. Becker,* 326 Mo. 1193, 34 S.W.2d 27, 29 (1930) (holding that, if possible, statutes must be construed by the court so that they do not violate the Constitution).

Thus, although the dictionary and technical meanings of terms used in the phrase "long-term full and partial requirements sales" are relevant to our *de novo* review of the PSC's Order, they are neither our starting point nor dispositive. We are primarily concerned with whether the competing definitions proffered by the parties would render the fuel adjustment clause unlawful. We will not ascribe a meaning to the phrase "longterm full and partial requirements sales" that would call the lawfulness of the fuel adjustment clause into question, as that would be an unrea-

sonable and absurd result. *See Aquila Foreign Qualifications,* 362 S.W.3d at 4.

**(iv) Construction of the Phrase "Long-term Full and Partial Requirements Sales" Consistent with the PSC's Statutory Authority**

### (a) The purpose of fuel adjustment clauses

" 'A fuel adjustment clause is a clause, filed as part of an electric utility's tariff, which allows it automatically to increase or decrease the charge for power per kilowatt-hour to consumers *by the amount of an increase or a decrease in the utility's fuel costs.*' " *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n,* 311 S.W.3d 361, 363 (Mo.App. W.D.2010) (quoting *Util. Consumers Council,* 585 S.W.2d at 44) (emphasis added). The authorized purpose for fuel adjustment clauses is drawn from section 386.266.1:

> [A]ny electrical corporation may make an application to the [PSC] to approve rate schedules authorizing an interim energy charge, or periodic rate adjustments outside of the general rate proceedings *to reflect increases and decreases in its prudently incurred fuel and purchased-power costs,* including transportation.

(Emphasis added.) The authorized purpose for a fuel adjustment clause is repeated in the regulations promulgated by the PSC pursuant to section 386.266.9:

> Fuel adjustment clause (FAC) means a mechanism established in a general rate proceeding that allows periodic rate adjustments, outside a general rate proceeding, *to reflect increases and decreases in an electric utility's prudently incurred fuel and purchased power costs.*

4 C.S.R. 240–20.090(1)(C) (emphasis added). The statutorily authorized purpose

for fuel adjustment clauses affords our first clue to the appropriate construction of Ameren's fuel adjustment clause.

Ameren asks us to construe the phrase "long-term full and partial requirements sales" to permit it to *recover unexpectedly lost revenue in order to recoup fixed costs.* This purpose is revealed with clarity in Ameren's Brief:

> Because Noranda lost approximately two-thirds of its production, its electricity consumption ... also dropped by approximately the same amount. Because Noranda's load was approximately 9 to 10% of Ameren's total load ... the severe reduction in Noranda's load meant that Ameren stood to lose an extremely large sum of revenue.... Had the loss of such revenues been accompanied by a concomitant reduction in costs, Ameren would not have suffered harm, but that was not the case. This is because providing electric service requires a utility to incur a large level of fixed costs that do not vary whether load goes up or down. Consequently, the facts facing Ameren [ ] were that its largest customer by far had suffered a roughly two-thirds reduction in load that might be permanent, but that in any event was likely to persist for a year or more; that its fixed costs of providing service had not been reduced at all; and that base rates had just been set on the assumption that a very large stream of revenues from Noranda would be received to cover the share of fixed costs that had been allocated to service to Noranda as part of the ratemaking process....

[Ameren's Brief pp. 5–7]. Ameren's purpose is also revealed by its evidence presented to the PSC. For example, Barnes testified that the AEP and Wabash "contracts simply allowed Ameren [ ] to recover costs that had previously been allocated to Noranda sales."

No one quarrels that Ameren suffered a significant and unexpected loss of revenue as a result of the ice storm. However, Ameren cites no authority suggesting that the PSC had any power to adopt initially, or by later interpretation, a fuel adjustment clause which would permit Ameren to recover lost retail revenue in order to cover fixed costs.

In fact, we have previously held that a fuel adjustment clause cannot be used to recover lost revenues. In *Laclede Gas Co.*, we rejected a gas utility's attempt to "use the purchased gas adjustment mechanism to recover the cost of the gas supplied to customers who failed to pay their bills." 328 S.W.3d at 318–19. We observed:

> The purchased gas adjustment mechanism is meant to account for fluctuations in the gas market. It merely provides a mechanism to allow a company to pass on increases or decreases in the cost of gas from a set base cost to its customers. Laclede's bad debt expense does not affect the rate that Laclede is charged for gas. In other words, the base cost of gas does not increase or decrease based upon the amount of bad debt Laclede incurs. *Recovering gas costs associated with bad debts are simply not the type of costs for which the purchased gas adjustment mechanism is meant to be used. Gas costs associated with bad debts are of an entirely different character than gas expenses that are currently passed through to customers under the purchased gas adjustment mechanism.*

*Id.* at 319 (emphasis added). Plainly stated, "[b]ad debt is *more accurately described not as a cost but as a loss of earned revenue.* It bears no relationship to the cost of fuel, let alone the fluctuation of fuels costs that the purchased gas ad-

justment is intended to ameliorate." *Id.* at 320 (emphasis added).

Similarly, Ameren urges a construction of its fuel adjustment clause that would permit the clause to be employed for an unlawful purpose-to recoup lost retail revenues that bear no relationship to the variable cost of fuel or purchased power. Though Barnes testified that the AEP and Wabash "contracts simply allowed Ameren [ ] to recover costs *that had previously been allocated to Noranda sales,*" in reality, Ameren seeks nothing more that to recover lost retail revenues it had assumed it would receive when setting its rates in the 2008 general rate case. (Emphasis added.)

 Simply stated, Ameren asks us to interpret the phrase "long-term full and partial requirements sales" to permit an interim rate increase outside a general rate proceeding to address a contingency not anticipated by section 386.266.1. The PSC's discretion to adopt, interpret, and/or apply fuel adjustment clauses exists "only *within* the circumference of the powers conferred on it by the legislature." *Util. Consumers Council,* 585 S.W.2d at 56. Variables not expressly envisioned within the scope of a legislatively authorized interim rate adjustment tool like a fuel adjustment clause may only be remediated, if at all, in a general rate case. *Laclede Gas Co.,* 328 S.W.3d at 320. (holding that Laclede's ability to seek recovery of lost reve-

nue, if at all, is "though [a] general rate case"); *Util. Consumers Council,* 585 S.W.2d at 57 (holding that "[i]f [an] electric compan[y] [is] faced with an 'emergency' situation ... they can take advantage of the method set up by the legislature to deal with such situations"). The PSC had no authority to adopt, interpret, or apply Ameren's fuel adjustment clause to permit interim rate adjustments to address variances in *revenue.*[21] For this reason alone, we are unable to accept Ameren's proffered definition for the phrase "long-term full and partial requirements sales," as the definition would render the fuel adjustment clause unlawful.

Our rejection of Ameren's proffered definition does not end our *de novo* review. We must still determine whether the PSC's construction of the phrase "long-term full and partial requirements sales," which permitted existing municipal contracts—though off-system sales—to be excluded from consideration in the fuel adjustment clause formula, constituted a lawful construction of the fuel adjustment clause. Resolving this question requires an understanding of the authorized means for addressing off-system sales in a fuel adjustment clause.

### (b) The authorized treatment of off-system sales in a fuel adjustment clause

Consistent with its authority pursuant to section 386.266.9, the PSC promulgated 4

---

**21.** Ameren's witness Barnes provided prefiled testimony in a general rate proceeding filed by Ameren in 2010, PSC Case Number ER–2010–0036 (the "2010 general rate case"). In that testimony, Barnes explained that Ameren's fuel adjustment clause "was adjusted to ... provide an 'N factor' to protect [Ameren] against a catastrophic loss of Noranda's load." Barnes further testified that had the fuel adjustment clause in effect as a result of the 2010 general rate case been in effect in 2009, "[Ameren] would have been fully protected from the adverse financial con-

sequences of the loss of the Noranda load." The precise language of the "N factor" described by Barnes is not in the record on appeal. The lawfulness or reasonableness of a fuel adjustment calculated by employing the "N factor" is not before us. But, for the reasons explained herein, we express strong reservations about the enforceability of any provision in a fuel adjustment clause that is designed and intended to operate to protect a utility from "the adverse financial consequences" of the loss of revenue, retail or otherwise.

CSR 240–20.090.[22] The purpose statement provides that the "rule sets forth the definitions, structure, operation, and procedures relevant to the filing and processing of applications to reflect prudently incurred fuel and purchased power costs through … a fuel adjustment clause which allows periodic rate adjustments outside general rate proceedings." 4 CSR 240–20.090.

The regulation defines a "fuel adjustment clause" as "a mechanism established in a general rate proceeding that allows periodic rate adjustments, outside a general rate proceeding, to reflect increases and decreases in an electric utility's prudently incurred fuel and purchased power costs." 4 CSR 240–20.090(1)(C). The regulation provides that a fuel adjustment clause "may or may not include off-system sales revenues and associated costs." *Id.*

The regulation defines "fuel and purchased power costs" which must be considered in calculating a fuel adjustment. 4 CSR 240–20.090(1)(B). The definition varies depending upon whether off-system sales revenues and associated costs are "reflected" in the fuel adjustment clause. If off-system sales revenues and associated costs *are not* reflected in the fuel adjustment clause, then "fuel and purchased power costs only reflect the prudently incurred fuel and purchased power costs necessary to serve the electric utility's Missouri retail customers." 4 CSR 240–20.090(1)(B)1. If off-system sales revenues and associated costs *are* reflected in the fuel adjustment mechanism, then "fuel and purchased power costs reflect both: (A) The prudently incurred fuel and purchased power costs necessary to serve the electric utility's Missouri retail customers; and (B) The prudently incurred fuel and purchased power costs associated with the electric utility's off-system sales." 4 CSR 240–20.090(1)(B)2. The regulation thus envisions only two scenarios: either *all* off-system sales revenues and associated costs are to be reflected in a fuel adjustment clause formula or *no* off-system sales revenues or associated costs are to be reflected in a fuel adjustment clause formula.

Generally, Ameren's fuel adjustment clause was drafted to reflect off-system sales revenue and associated costs consistent with the option described in 4 CSR 240–20.090(1)(B)2. Thus, in calculating an interim rate adjustment under the clause, Ameren's prudently incurred fuel and purchased power costs included those necessary to serve Ameren's Missouri retail customers *and* the fuel and purchased power costs associated with off-system sales. Because off-system sales are reflected in the fuel adjustment clause, Ameren is required to subtract, or offset, its actual fuel costs by off-system sales revenue to calculate its "net fuel cost" which, when compared to the base fuel cost, determines the interim rate adjustment.[23]

Though Ameren's fuel adjustment clause *generally* comported with the option described in 4 CSR 240–20.090(1)(B)2, the definition of "off-system sales" in the Am-

---

**22.** The PSC also promulgated 4 CSR 240–3.161, which sets forth the information a utility must provide when it seeks to establish or modify a fuel adjustment clause. While the two regulations have overlapping definitions of key terms, we refer to 4 CSR 240–20.090 throughout the opinion because it concerns the processing of applications for fuel adjustment clauses. How the PSC processes applications for fuel-adjustment clauses provides

insight into the PSC's intent in approving the stipulated language of Ameren's fuel adjustment clause.

**23.** As discussed *supra*, pursuant to the 95/5 percent sharing mechanism, 95 percent of this determined rate adjustment is passed on to the ratepayers, while 5 percent is absorbed or retained as the case might be by Ameren.

eren tariff excluded a category of off-system sales—"long-term full and partial requirement sales." As drafted, therefore, Ameren's fuel adjustment clause is a hybrid of the scenarios anticipated by both 4 CSR 240–20.090(1)(B)1 and 4 CSR 240–20.090(1)(B)2. In other words, Ameren's fuel adjustment clause reflected some, but not all, off-system sales revenues and associated costs.

4 CSR 240–20.090 does not expressly envision the approval of a hybrid fuel adjustment clause. Because the general lawfulness of hybrid fuel adjustment clauses is not raised here, we reserve judgment with respect to whether they are authorized by the regulation. For our purposes, however, we note that it is not out of the realm of possibility that a hybrid fuel adjustment clause could operate consistent with the premises underlying both 4 CSR 240–20.090(1)(B)1 and 4 CSR 240–20.090(1)(B)2 if a hybrid clause operates to reflect revenues and associated costs for included off-system sales and to not reflect revenues and associated costs for excluded off-system sales. In other words, we do not believe that a fuel adjustment clause that affords consideration of revenues without commensurate consideration of associated costs (or vice versa) is permitted by either 4 CSR 240–20.090(1)(B)1 or 4 CSR 240–20.090(1)(B)2.

The PSC's Order construed "long-term full and partial requirements sales" to be limited in meaning to contracts like the four municipal "requirements services" contracts Ameren had in place at the time the 2008 general rate case was opened. The PSC's Order explained that excluding these off-system sales contracts from the definition of "off-system sales" used in the Ameren tariff made sense because Ameren's costs associated with those municipal contracts "were allocated to municipal utilities through energy and demand alloca-

tors," and that as a result, Ameren's "costs to provide wholesale service to the municipalities *[would not be] flowed through the Fuel Adjustment Clause [rendering it] inappropriate to flow the revenues received from the municipalities through the Fuel Adjustment Clause.*" (Emphasis added.) In other words, where ordinarily an electric utility's fixed costs (*i.e.*, for its generation facilities) are paid by ratepayers, the evidence in this case indicated that fixed and other costs incurred to produce power required to be sold by Ameren under the four municipal contracts had been allocated to the municipalities through energy and demand allocators. The "excluded" category of off-system sales represented by the four municipal contracts was fair to ratepayers because ratepayers where not being asked to pay for the fixed (or other) costs to produce the power supplied under those contracts. Thus, it made no sense to offset the revenues from those contracts in connection with the fuel adjustment calculation.

We conclude, therefore, that the PSC's definition of "long-term full and partial requirements sales contracts" as limited to the four municipal contracts in existence when the 2008 general case was opened is reasonable, as the definition is not susceptible to rendering Ameren's fuel adjustment clause unlawful. We also observe that the definition adopted by the PSC's Order is supported by competent and substantial evidence in the record as a whole.

The only witness who testified about a recollection of the discussions leading to Ameren's request to except "long-term full or partial requirements sales" from the definition of "off-system sales" was Lena Mantle ("Mantle"), the Manager of the Energy Department, Utility Operations Division of the PSC. Her testimony indi-

cated her recollection that Ameren sought the exception from the definition of "off-system sales" to capture the four existing municipal contracts. Mantle explained that the PSC Staff was comfortable excluding these the revenues from these existing contracts from the definition of off-system sales used in the Ameren tariff because:

> *It would have been inappropriate to flow the revenues from these municipal utilities' contracts through Ameren Missouri's [fuel-adjustment clause] because Ameren Missouri's costs associated with the cost to serve the municipal utilities were not being flowed through Ameren Missouri's [fuel-adjustment clause].* If the revenues from the contracts flowed back to the customers through the [fuel-adjustment clause], but the revenue requirements that set the rates for retail customers did not include Ameren Missouri's costs associated with those contracts, then Ameren Missouri would have had to pay all the costs of the contracts, but only receive 5% of the revenues from them.

(Emphasis added.) Mantle also testified that Ameren never indicated during the negotiations in the 2008 rate case that it intended for contracts like those entered into with AEP and Wabash to be excluded from the definition of off-system sales.

Henry Fayne ("Fayne"), a consultant in the electric energy sector since 2005, testified on behalf of MIEC. Fayne's testimony provided insight into the electric energy sector that supported Mantle's recollection that Ameren sought to exclude the municipal contracts from the definition of off-system sales by labeling those municipal contracts as "long-term full and partial requirements sales." He explained that "[t]ypically, off-system sales are characterized as opportunity sales" in that "[t]hey represent sales of excess power that is not currently required by the utility to meet its firm long-term retail and wholesale load requirement." These off-system sales are in contrast to "wholesale partial and full requirements contracts." According to Fayne, the wholesale partial and full requirements contracts "represent load that is included in jurisdictional cost allocation" during the ratemaking process. In other words, the costs for those contracts are allocated to the specific customers rather than to the retail ratepayers.

Though Ameren refutes Mantle's recollection of the purpose for Ameren's request to exclude "long-term full and partial requirements sales" from the definition of "off-system sales,"[24] Ameren offered no evidence about what it intended the phrase to cover at the time the exception was requested. Ameren concedes that the revenues from the four municipal contracts in existence when its fuel adjustment clause was approved "were excluded from off-system sales in the development of base rates set in [the 2008 general rate case]." [Ameren's Brief, p. 13]. And Barnes testified for Ameren that the municipal contracts in existence when the 2008 general rate case was opened involved "requirements customers" to whom *"[a]n appropriate portion of [Ameren's] costs have been allocated … in rate cases."* (Emphasis added.)

In contrast, the AEP and Wabash contracts, even if viewed as "long-term" because they exceeded a year in length, were

---

**24.** Ameren denies that it advised Mantle that it wanted to exclude "long-term full and partial requirements sales" from the definition of "off-system sales" in order to capture the revenues and costs associated with the existing municipal contracts. Ameren also attempts to impeach Mantle's testimony because she cannot recall with which Ameren representative she spoke.

not demonstrative of off-system sales to customers to whom the costs to produce power had been allocated. Ameren admits as much, as Barnes testified that the "[AEP and Wabash] contracts simply allowed Ameren [ ] *to recover costs that had previously been allocated to Noranda sales.*" (Emphasis added.) Clearly, the AEP and Wabash contracts were not off-system sales of the character reflected in the four existing municipal contracts. They were instead "opportunity sales," entered into as a function of excess power not then required to meet Ameren's load requirements. In this respect, the contracts were "run-of the mill" off-system sales, because ratepayers were paying for the plants that created the excess capacity and energy available to be sold to non-retail customers. *Public Counsel,* 274 S.W.3d at 585.

Tellingly, Ameren's conduct immediately after the ice storm strongly suggests that Ameren appreciated the exclusion it had negotiated from the definition of "off-system sales" for "long-term full and partial requirements sales" was of limited scope and was certainly not so broad as to exclude sales of excess load to off-system customers based solely on whether Ameren could negotiate a contract that was a year or more in duration. Ameren's first response to the anticipated impact of the loss of the Noranda load following the ice storm was to request a temporary modification to its fuel adjustment clause to permit it to sell the unused Noranda load off system without being required to reflect the revenue in its fuel adjustment clause. Ameren would have had no need to seek permission to temporarily modify its fuel adjustment clause if it believed the phrase "long-term full and partial requirements sales" had the meaning now urged by Ameren on appeal.

Based on the legal restraints imposed on the PSC's authority by section 386.266 and 4 CSR 240–20.090, and in light of the substantial and competent evidence in the record as a whole, we conclude that "long-term full and partial requirements sales" referred to the four existing municipal contracts in existence when the 2008 general rate case was opened.[25] This conclusion ascribes a meaning to the otherwise undefined phrase that is consistent with the evidence, that is consistent with the limited statutorily authorized purpose for fuel adjustment clauses, and that will not render the fuel adjustment clause susceptible to a finding that the clause exceeds the PSC's statutory authority.

Though as a result of our *de novo* review, we conclude that the PSC's interpre-

---

**25.** The evidence indicated that Ameren is not likely to enter into other contracts like the four existing municipal contracts. Haro testified that utilities no longer enter into five-, ten-, and twenty-year contracts with municipalities. Mantle testified that municipalities no longer have the ability to accurately forecast their loads over a long period of time and are thus not inclined to enter into such contracts. This testimony further supports our conclusion that the phrase "long-term full and partial requirements sales" was intended to encompass only the four municipal contracts in existence when the 2008 general rate case was opened.

We are aware that the exclusion for "long-term full and partial requirements sales" was amended by the PSC in the Ameren tariff in its 2010 general rate case to read "long-term full and partial requirement sales *to Missouri municipalities.*" (Emphasis added.) The modification is of no import to our decision, as it simply clarifies the intended scope of the exclusion as approved in the 2008 general rate case. Moreover, because it is highly unlikely that Ameren will enter into new municipal contracts like the four in existence, the exclusion, whether in its original form as approved in the 2008 general rate case or as modified in the 2010 general rate case, will have no practical impact on the operation of Ameren's fuel adjustment clause.

tation of the phrase "long-term full and partial requirements sales" is reasonable, we are troubled by the imprecise manner in which the PSC Staff, and ultimately the PSC, defined "off-system sales." Given the integral importance of off-system sales to proper application of the fuel adjustment clause, it defies our comprehension that the PSC approved a vague and undefined exclusion to the definition in lieu of clearly referencing the four existing municipal contracts whose revenues it was permitting Ameren to retain.[26]

(v) **Ameren's contention that the PSC's construction is not equitable**

Ameren argues that the AEP and Wabash contracts should not have been included in the fuel adjustment calculation because to conclude otherwise imposes an extraordinary financial hardship on Ameren. Ameren contends that:

> [The PSC's order] requir[es] Ameren to bear millions of dollars in fixed costs Noranda's retail revenues no longer covered because of the ice storm, while giving the benefits of the revenues from the megawatt-hours Noranda could not take to customers, thereby lowering customer bills with dollars that but for the ice storm customers would never have received.

[Ameren's Brief p. 30.] Ameren fails to appreciate that a fuel adjustment clause is not intended to permit recovery of lost revenues. Had the Ameren tariff not included a fuel adjustment clause or had Ameren's fuel adjustment clause strictly followed the template outlined in 4 CSR 240–20.090(1)(B)(2) by reflecting *all* off-system sales without exclusion, then Ameren would have *no* argument that it should be entitled to an interim rate adjustment designed to remediate the unexpected loss of the Noranda load. We are not persuaded by Ameren's emotive equitable appeal, which is built on a shaky foundation— Ameren's opportunistic manipulation of the definition of "long-term full and partial requirements sales." Plainly stated, a fuel adjustment clause is neither intended nor authorized to permit an electric utility to implement interim rate adjustments outside a general rate case to respond to a sudden, even calamitous, loss of retail revenue. Ameren has no basis in fact or in law to argue otherwise.

Ameren had other remedies available to it to address its unexpected retail revenue loss. Barnes testified that Ameren could have sought an accounting authority relating to the lost revenue in a subsequent rate case. In addition, Barnes testified that Ameren could have immediately filed a new general rate case to recover the lost fixed costs associated with the lost Noranda load.[27] There may have been other regulatory options available to Ameren.[28]

---

**26.** We remind that as we discussed *supra*, we have reserved ruling on the PSC's authority to approve hybrid fuel adjustment clauses as that issue is not squarely before us.

**27.** In fact, it appears Ameren did precisely that. It filed the 2010 general rate case referenced in footnote 20 barely two years after it filed the 2008 general rate case and just a year after the Ameren tariff approved in the 2008 general rate case took effect on March 1, 2009. In fact, the 2010 general rate case was filed in the same year, presumably at or near the same time as the PSC's Staff's pru-

dence review of Ameren's initial fuel adjustment calculations.

**28.** Mantle testified that Ameren could have asked the PSC to completely cancel or withdraw the fuel-adjustment clause in its application for rehearing. We are not confident that Ameren could have requested this relief. Section 386.266.5 provides that "[o]nce ... an adjustment mechanism is approved by the [PSC] under this section, it shall remain in effect until such time as the [PSC] authorizes the modification, extension, or discontinuance of the mechanism *in a general rate case or complaint proceeding.*" (Emphasis added.)

It is neither our place nor our obligation to identify the remedy Ameren should have employed. For our purposes, all that matters is that the fuel adjustment clause was not an available mechanism to remediate Ameren's lost retail revenues. As we held in *Public Counsel,* interim rate adjustment clauses permit *"single issue* ratemaking." 331 S.W.3d at 690–91. The "General Assembly understood the different roles between single issue ratemaking mechanisms and *full rate case* proceedings." *Id.* at 690. A utility cannot insist on consideration of lost revenue when calculating a fuel adjustment if the legislature has clearly and unambiguously expressed its intent that such clauses are meant to address a single issue—the fluctuation in the variable cost of fuel and purchased power. In fact, our decision in *Public Counsel* was favorably cited in *Noranda Aluminum* to make precisely this point:

> The Western District stated that "section 386.266 permissibly authorizes a *single issue* ratemaking mechanism that allows periodic (automatic) adjustments outside a general rate case where other costs and revenues are *not* considered." *In other words, the statute does not require a guarantee that there will be no savings or additional revenues to offset the assistance provided by a cost recovery mechanism.*

356 S.W.3d at 313–14 (quoting *Public Counsel,* 331 S.W.3d at 690) (final emphasis added) (citations omitted). Similarly, section 386.266 does not guarantee a utility that it will have experienced all anticipated savings or received all anticipated revenues to offset the possible detriment of operation of a cost recovery mechanism.

---

Similarly, 4 CSR 240–20.090(3) provides that "[t]he [PSC] shall allow or require the rate schedules that define and implement a [rate adjustment mechanism] to be discontinued

In short, any inequity Ameren now faces is a result of its decision to gamble when it entered into the AEP and Wabash contracts. Ameren's attempt to shock this Court's sense of justice ignores that the risk of a dramatic loss of retail revenue is a business risk every utility faces independent of the presence or absence of a fuel adjustment clause in the utility's tariff. More to the point, the risk of lost revenue is simply not a risk a utility is authorized to remediate with a fuel adjustment clause.

The PSC did not err in its construction of the Ameren tariff to constrain the meaning of the phrase "long-term full and partial requirements sales" to the four municipal contracts in place at the time of the 2008 general rate case.

Point One is denied.

## Points II and III

In its second point on appeal, Ameren contends that it was unlawful for the PSC to order refunds because the PSC lacked authority to do so unless it found Ameren acted unreasonably and that its actions harmed ratepayers. In its third point on appeal, Ameren argues that the PSC erred in concluding that Ameren acted imprudently in treating the AEP and Wabash contracts as long-term partial requirements sales because its decision was not supported by competent and substantial evidence on the record and was an abuse of discretion. Both points address the lawfulness and/or reasonableness of the PSC's "imprudence" determination. We address the points collectively.

### Standard of Review

Ameren's second point relied on asserts the PSC acted in excess of its statutory

---

and withdrawn *only after providing the opportunity for a full hearing in a general rate proceeding."*

authority so that the PSC's Order was unlawful. As we discuss *infra*, however, Ameren's point relied on does not implicate the PSC's statutory authority. Thus, our review of this point is pursuant to the reasonableness prong. Ameren's third point relied on asserts the PSC acted unreasonably and/or abused its discretion. Our review of this point is also pursuant to the reasonableness prong. We need not repeat our earlier explanation of the standard of review under the reasonableness prong.

*Analysis*

Ameren's second point relied on argues that the PSC lacked the authority to order Ameren to issue refunds to its ratepayers. Ameren notes that the PSC found that it acted prudently when it entered into the AEP and Wabash contracts to replace the unexpected loss to the Noranda load. Ameren further contends that the PSC lacked authority to order a refund because its ratepayers did not suffer harm.

■■■ The Ameren tariff requires the PSC to conduct "[p]rudence reviews of the costs subject to this [fuel-adjustment clause] . . . no less frequently than every eighteen months." The prudence review concerns whether "[Ameren's] conduct was reasonable at the time, under all the circumstances. . . . In effect, [it is the PSC's] responsibility . . . to determine how reasonable people would have performed the tasks that confronted the company." *State ex rel. Associated Natural Gas Co. v. Pub. Serv. Comm'n*, 954 S.W.2d 520, 529 (Mo. App. W.D.1997). Using this standard, the PSC concluded that although Ameren acted prudently in entering into the AEP and Wabash contracts, it acted imprudently when it classified the AEP and Wabash contracts as "long-term partial requirements sales" and excluded the revenues from those sales from the calculation of actual net fuel costs.

■■■ Ameren's point relied on only addresses the PSC's finding that Ameren acted prudently in entering into the AEP and Wabash contracts. Ameren's point relied on ignores that the PSC based the decision to order refunds on its finding that Ameren imprudently characterized the contracts as "long-term full and partial requirements sales." Clearly, the PSC had the statutory authority to make such a determination. As we have held *supra*, the AEP and Wabash contracts were off-system sales that should have been included in the actual net fuel costs calculation. Accordingly, the PSC reasonably concluded that Ameren was imprudent when it violated the terms of its tariff. The PSC was thus required to order a "refund of any imprudently incurred costs plus interest at the utility's short-term borrowing rate." Section 386.266.4(4). Obviously, if an electric utility fails to properly account for revenue in a fuel adjustment clause, then it will have skewed the calculation of incurred costs passed through to ratepayers by the fuel adjustment. Ameren does not argue to the contrary.

■■■ Ameren secondarily argues that the PSC lacked authority to order a refund because its failure to consider the revenues from the AEP and Wabash contracts calculating its actual net fuel costs resulted in no harm to ratepayers. Ameren cites no authority for the proposition that the PSC lacks authority to order a refund to ratepayers unless the utility's imprudent act causes the ratepayers harm. *See Capital One Bank v. Hardin*, 178 S.W.3d 565, 573 (Mo.App. W.D.2005) (holding that an argument on appeal is abandoned if the party cites no authority whatsoever to support the claim).

In any event, Ameren misapprehends the concept of harm. Ameren claims that but for the ice storm and Noranda's cur-

tailed production resulting therefrom, Ameren would not have entered into the AEP and Wabash contracts. Thus, Ameren contends, the revenue from the AEP and Wabash contracts merely replaced the revenue it expected to receive from Noranda so that ratepayers suffered no harm. The PSC rejected Ameren's argument, finding that Ameren's failure to include the revenue from the AEP and Wabash contracts in the actual net fuel costs calculation resulted in the ratepayers losing the benefit of the bargain reflected in the Ameren tariff. We agree.

Ameren was not obligated to include a fuel adjustment clause in its tariff. It sought to do so. The *quid pro quo* for a fuel adjustment clause is its potential operation both to a utility's benefit and detriment. Under the Ameren tariff, ratepayers were obligated to pay an increased rate in the event that fuel prices rose or off-system sales decreased but would benefit from a decreased rate if fuel prices dropped or if Ameren's off-system sales increased. By failing to reflect the revenue from the AEP and Wabash contracts in its actual net fuel costs calculation, Ameren violated its tariff. A utility has no right to violate its tariff with impunity. Because the AEP and Wabash contract revenues were not reflected in the actual net fuel costs calculation, the ratepayers overpaid Ameren $17,169,838. It is immaterial that the AEP and Wabash contract revenues "replaced" retail revenues that would not have benefitted ratepayers. As we have discussed, a fuel adjustment clause is a single issue ratemaking tool. It is neither designed nor permitted to address (or remediate) every variable which may affect the sufficiency of a utility's rates or its return on investment. The PSC did not err in ordering a refund to Ameren's ratepayers. *See Util. Consum-*

*ers Council,* 585 S.W.2d at 59–60 (holding that where a utility has no legal right to retain monies unlawfully collected, a refund may be ordered to avoid a windfall to the utility, as to hold otherwise "would leave ... customers without a remedy"). We reject Ameren's second point relied on.

In its third point relied on Ameren argues that the definition of "long-term full and partial sales requirements" adopted by the PSC is not supported by substantial and competent evidence, and that it was an abuse of discretion to "force[ ] Ameren to bear the fixed costs the Noranda revenues would no longer cover." We have already determined in our discussion of Ameren's first point relied on that the PSC's construction of the phrase "long-term full and partial requirements sales" was supported by competent and substantial evidence on the record and that Ameren's reliance on principles of equity as a basis to avoid the constraints of the fuel adjustment clause in its tariff is misplaced. Ameren's third point relied on is denied.

The PSC did not err in concluding that Ameren acted imprudently in excluding the revenues from the AEP and Wabash contracts from the fuel adjustment calculation or in ordering Ameren to refund its ratepayers $17,169,838.

## Conclusion

We reverse the judgment of the circuit court and affirm the PSC's Order requiring Ameren to refund its ratepayers $17,169,838 [29] for the reasons and on the basis herein described.

All concur.

---

29. Pursuant to 4 CSR 240–20.090(7)(A), "[a]ll amounts ordered refunded by the [PSC] shall

include interest at the electric utility's short-
term borrowing rate." *See also* section

386.266.4(4).